IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|                                                         |   |                          |
|---------------------------------------------------------|---|--------------------------|
| MARIA MOORE,                                            | ) |                          |
|                                                         | ) |                          |
|                                  Plaintiff,             | ) | Case No. 09 C 1723       |
| v.                                                      | ) |                          |
|                                                         | ) | Judge Virginia M. Kendall |
| P&G-CLAIROL, INC., and THE PROCTOR &                    | ) |                          |
| GAMBLE COMPANY,                                         | ) |                          |
|                                                         | ) |                          |
|                                  Defendant.             | ) |                          |

## MEMORANDUM OPINION AND ORDER

Plaintiff Maria Moore ("Moore") brought this product liability action against P&G-Clairol Inc. ("Clairol"), alleging that she had a severe allergic reaction to Clairol hair dye. Clairol has filed a combined motion to exclude Moore's expert under the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and for summary judgment (Doc. 62). Clairol asserts that the expert's testimony is not admissible because he is not qualified to opine the dye is unreasonably dangerous and that Clairol's warnings were inadequate, and his methods in reaching those conclusions were unreliable. According to Clairol, if Moore's expert's testimony is excluded, Clairol is entitled to summary judgment because Moore cannot show a causal link between the injury and the alleged defect in the dye. For the reasons detailed below, the Court grants Clairol's motion to exclude Moore's expert and enters summary judgment for Clairol.

I.    STATEMENT OF UNDISPUTED FACTS

    A.    Moore's Purchase and Application of the Dye and the Dye's Instructions.

Moore, a 17-year old student, purchased a box of Clairol Natural Instincts hair color, shade

No. 36 ("the dye"), on March 2, 2007 at 5:07pm.  (Pl. 56.1 Resp. ¶ 5; Moore Dep., Pl. Ex. A at 5.)

The outer packaging of the dye had a warning that stated, in part:



**IMPORTANT SAFETY WARNINGS**

HAIRCOLOR PRODUCTS CAN CAUSE ALLERGIC REACTIONS WHICH IN
RARE CASES CAN BE **SEVERE**

TATTOOS MAY INCREASE YOUR RISK OF ALLERGY TO THIS PRODUCT.
CONDUCT A SKIN ALLERGY TEST **48 HOURS BEFORE** EACH TIME YOU
COLOR EVEN IF YOU HAVE ALREADY USED COLORING PRODUCTS
BEFORE.   SO REMEMBER TO BUY THE PRODUCT **48 HOURS IN
ADVANCE**.

(Pl. 56.1 Resp. ¶ 8; Def. 56.1 Ex. 8, emphasis in original).  The packaging also states: "THIS

PRODUCT CONTAINS INGREDIENTS WHICH MAY CAUSE SKIN IRRITATION ON

CERTAIN INDIVIDUALS AND A PRELIMINARY TEST ACCORDING TO ACCOMPANYING

DIRECTIONS SHOULD FIRST BE MADE."  (Pl. 56.1 Resp. ¶ 8, emphasis in original.)  The inner

packaging contained the following warnings:

**BEFORE YOU COLOR: 48 HOURS IN ADVANCE**

• Take the ALLERGY TEST.
• Do the STRAND TEST to determine your optimal coloring time.
• Read the entire instruction leaflet before you begin.

**IMPORTANT: SAFETY INSTRUCTIONS**

HAIR COLORANTS CAN CAUSE ALLERGIC REACTIONS WHICH IN RARE INSTANCES CAN BE SEVERE.
TATTOOS MAY INCREASE YOUR RISK OF ALLERGY. TO REDUCE YOUR RISK FOLLOW THESE INSTRUCTIONS:

1. DO NOT USE THIS PRODUCT AT ALL IF:
   • You have already experienced any reaction to coloring products.
   • You have sensitive, irritated or damaged scalp.
In these cases do not conduct the skin allergy test and consult a doctor before using any haircolor product.
NEED ADVICE? Call the Expert Color Consultants at 1-800-CLAIROL (1-800-252-4765).
2. PERFORM A SKIN ALLERGY TEST 48 HOURS BEFORE EACH PRODUCT-USE even if you have already used coloring products before.

**SKIN ALLERGY TEST INSTRUCTIONS**

MUST BE PERFORMED 48 HOURS BEFORE YOU COLOR YOUR HAIR: You will need a cotton ball or swab, a plastic bowl and a plastic spoon.
1. To open, unscrew the entire Gentle Activating Creme cap (Bottle #2). Don't pull off the tab. Then unscrew the
   Color-Enhancing Colorant (Bottle #1).
2. Mix small, equal parts of the Color-Enhancing Colorant and Gentle Activating Creme in a plastic bowl.
3. Tightly recap both bottles.
4. Apply mixture to a test area the size of a quarter in the bend of your elbow. Allow to dry. Use remaining mixture for the Strand Test.
   Do not wash this area for 48 hours. During washing, protect with an adhesive bandage and remove it immediately after washing.
5. Examine the test area during the next 48 hours. If no reaction occurs, you are ready to color.
The absence of reaction to this test is no guarantee that an allergic reaction may not occur as a result
of a future haircoloring process. However, this test represents an important precaution.
Please consult a doctor if you have any doubts.
NOTE: IF A RASH, REDNESS, BURNING OR ITCHING OCCURS YOU MAY BE ALLERGIC. STOP. YOU MUST NOT USE THIS PRODUCT.

**BEFORE YOU COLOR: 48 HOURS IN ADVANCE**

•      Take the **ALLERGY TEST**.
•      Do the **STRAND TEST** to determine your optimal coloring time.
•      Read the entire instruction leaflet before you begin.

**IMPORTANT: SAFETY INSTRUCTIONS**

HAIR COLORANTS CAN CAUSE ALLERGIC REACTIONS WHICH IN RARE INSTANCES CAN BE **SEVERE**.  TATTOOS MAY INCREASE YOUR RISK OF ALLERGY, TO REDUCE YOUR RISK FOLLOW THESE INSTRUCTIONS:

1. DO NOT USE THIS PRODUCT AT ALL IF:
•      You have already experienced any reaction to coloring products.
•      You have sensitive irritated or damaged scalp.

3

In these cases do not conduct the skin allergy test and consult a doctor before using any haircolor product.

NEED ADVICE? Call the Expert Color Consultants at 1-800-CLAIROL (1-800-252-4765)

2. **PERFORM SKIN ALLERGY TEST 48 HOURS BEFORE EACH PRODUCT USE** even if you have already used coloring products before.

**SKIN ALLERGY TEST INSTRUCTIONS**

MUST BE PERFORMED **48 HOURS BEFORE** YOU COLOR YOUR HAIR: You will need a cotton ball or swab, a plastic bowl and a plastic spoon.

1. To open, unscrew the entire Gentle Activating Creme cap (Bottle #2). Don't pull off the tab. Then unscrew the Color-Enhancing Colorant (Bottle #1).

2. Mix small equal parts of the Color-Enhancing Colorant and Gentle Activating Creme in a plastic bowl.

3. Tightly recap both bottles.

4. Apply mixture to a test area the size of a quarter in the bend of your elbow. Allow to dry. Use remaining mixture for the Strand Test. During washing, protect with an adhesive bandage and remove it immediately after washing.

5. Examine the test area during the next 48 hours. If no reaction occurs, you are ready to color.

The absence of reaction to this test is no guarantee that an allergic reaction may not occur as a result of a future haircoloring process. However, this test represents an important precaution.

Please consult a doctor if you have any doubts.

**NOTE: IF A RASH, REDNESS, BURNING OR ITCHING OCCURS YOU MAY BE ALLERGIC. STOP. YOU MUST NOT USE THIS PRODUCT.**

(Pl. 56.1 Resp. ¶ 9; Def. 56.1 Ex. 9, emphasis in original.) Moore read and understood these

instructions and warnings, including the warnings that the dye could cause an allergic reaction, the

instructions to take an allergy test before using the dye, and the instructions to wait the prescribed

"period of time" for the results of that allergy test prior to using the product on her hair.  (Pl. 56.1 Resp. ¶ 10.)  She also understood that the skin allergy test would cause some reaction of either a rash, redness, burning or itching at the site of application to warn her if she was allergic to the dye. (Def.  56.1 Resp. ¶ 2.)

On March 2, 2007 Moore took the allergy test and applied the dye to her arm when she got home from purchasing the dye at approximately 5 p.m.  (Def. 56.1 Resp. ¶ 1; Moore Dep., Pl. Ex. A, 10:16-21.)  The next morning, she applied the dye to her hair between 7 a.m. and 8 a.m, which was approximately 14 or 15 hours after she purchased it.  (Pl. 56.1 Resp. ¶ 6.)  The instructions on the box instructed the user to wait 48 hours after the allergy test to apply the dye. (Moore Dep., Pl. Ex. A, 10:22-11:4.)  When she applied the dye to her hair, she had not suffered a reaction to the dye on her arm from the night before.  (Moore Dep. Pl. Ex. A, 11:11-18.)  Forty-eight hours after the skin allergy test, Moore still did not have any reaction to the dye on her arm.  (Def. 56.1 Resp. ¶ 4.)

B.      Moore's Allergic Reaction

Four days after dying her hair, on March 7, 2007 Moore developed bumps on the back of her head and had swollen glands.  (Pl. 56.1 Resp. ¶ 12; Moore Dep., Pl. Ex. A, 13:4-14:3.)  The next day, she saw a primary care physician, Dr. Nicholas Recchia, who diagnosed her with cervical adenitis, a bacterial infection of the lymph node of the neck. (Pl. 56.1 Resp. ¶ 13.)  On March 9, 2007, Moore developed itching and redness on her head and neck. (Pl. 56.1 Resp. ¶ 14; Moore Dep., Pl. Ex. A, 15:20-24.)  Her pain increased and her face started to swell.  (Def. 56.1 Resp. ¶ 6.)  She was admitted to the hospital and diagnosed with a severe allergic reaction with angiodema, sever contact dermatitis of the scalp and neck, and cervical adenitis. (Pl. 56.1 Resp. ¶ 15.)  While hospitalized, Moore experienced swelling of the head and face, redness along the hairline, little red

bumps, lumps on the back of her neck and swelling to the extent that she could not open her eyes. (Def. 56.1 Resp. ¶ 7.) Dr. Recchia was Moore's attending physician while she was at the hospital. (Pl. 56.1 Resp. ¶ 16.) Moore improved over the next 48 hours; she was discharged in good condition on March 12, 2007 and instructed to return to school the next day. (Pl. 56.1 Resp. ¶ 17.) After her discharge from the hospital, Moore continued to experience swelling, redness and bumps for a month, and continues to experience tightness in her chest and trouble breathing. (Def. 56.1 Resp. ¶ 9.) She also gained 20-25 pounds. (Def. 56.1 Resp. ¶ 10.)

Approximately two months later, on May 7, 2007, at the instructions of her dermatologist, Moore tested herself for an allergy to the dye by buying the same dye again and following the allergy test instructions on the box. (Pl. 56.1 Resp. ¶ 18.) This time, Moore had a "severe" reaction on the test site, which included blistering, redness, itching, swelling and scarring. (Pl. 56.1 Resp. ¶ 19.) Moore sued Clairol alleging negligence and product liability claims due to this allergic reaction to the dye. She claims both that the dye was unreasonably dangerous and that Clairol failed to adequately warn her that an allergic reaction could occur. (*See* Doc. 24.)[1]

## C.    The Qualifications, Methodology and Opinions of Moriarty, Moore's Expert Witness

In her Rule 26(a)(2) disclosures, Moore designated Robert M. Moriarty, Ph.D. ("Moriarty") as the only witness that would present opinion testimony under F.R.E. 702, 703 or 705. (*See* Doc. 80-2.)

### 1.    Moriarty's Opinions.

---

[1]Moore also sued the Proctor and Gamble Company, but that defendant was dismissed on September 9, 2009. (*See* Doc. 42.)

Moriarty's opinions, as stated in his report, are:

1.      [The dye] is composed of a number of dangerous chemicals that are skin irritants and allergenic.

2.      As manufactured, packaged, distributed, [the dye] was an unreasonably dangerous product.

3.      [Moore's] injuries were caused by her exposure to [the dye].

4.      The self test method instructed by the manufacturer is totally inappropriate and inadequate for the intended purpose of providing a warning to the consumer.

5.      [The dye] failed to provide an appropriate, adequate warning.

6.      [Moore] used [the dye] on the basis of a seriously flawed, inappropriate and inadequate test.

7.      Since the self test is so obviously inappropriate and inadequate for its intended purpose, the manufacturer should have been cognizant of this fact.

(Pl. Ex. J.)

2.      Moriarty's Qualifications.

Moriarty received several degrees in organic chemistry beginning in the 1950s, culminating in a doctoral degree in organic chemistry and served in several post-doctoral stints. (Def. 56.1 Resp. ¶ 13.) He received education and training with respect to organic synthesis, heterocyclic compounds and polymers. (Def. 56.1 Resp. ¶ 14.) He also worked as a junior chemist at Merck and Company from 1955 to 1957, where he came into contact with the rules of safety in a professional laboratory and material safety data sheets. (Def. 56.1 Resp. ¶ 16.) Since, he has worked as a chemist and chemistry . (Pl. 56.1 Resp. ¶ 27.) Moriarty has served as the chairman of the safety committee of his university's chemistry department and has been responsible for the safety of the university laboratory. (Def. 56.1 Resp. ¶ 17.) He has studied, taught, researched or written on a number of

chemicals and chemical reactions, yet the majority of his publications do not refer to the chemicals in the dye.  (Def. 56.1 Resp. ¶¶ 20-21.)

Moriarty has no expertise in the fields of psychology or human factors.  (Pl. 56.1 Resp. ¶ 35.) He has never done any work concerning self-administered tests for consumers before they use a product, or taught or written on the subject.  (Pl. 56.1 Resp. ¶ 36.)  Nor does he have any background knowledge regarding allergy tests in the consumer hair dye industry or knowledge as to why the allergy test was designed the way it was from a toxicological standpoint.  (Pl. 56.1 Resp. ¶¶ 37-38.) He has, however, performed thousands of laboratory tests involving mixing compounds in containers.  (Pl. 56.1 Resp. ¶ 18.)

### (a)    Methodology To Opine the Dye is Unreasonably Dangerous

Moriarty reached his opinion that the dye is an unreasonably dangerous product by looking at each individual component in the dye, searching the literature for its biological and chemical properties, and reviewing the component's material safety data sheet to determine the hazards and toxicities for those components.  (Def. 56.1 Resp. ¶ 24.)  He then compiled that data. (Def. 56.1 Resp. ¶ 24.)  The material safety data sheets do not provide the chemical concentration that will cause a harmful reaction in humans; although they may contain statistics concerning harmful reactions in animals.  (Def. 56.1 Resp. ¶ 25.)  Material data safety sheets are required to be drafted by manufacturers of chemicals by the Occupational Safety and Health Administration ("OSHA") to describe hazards associated with handling of chemicals in the workplace, and describe proper procedures for working with those chemicals.  (Pl. 56.1 Resp. ¶  48.)  The data sheets Moriarty relied on do not address consumer safety issues, nor do they pertain to the concentration, formulation

and packaging of the chemical ingredients in the dye or any other consumer hair dye.[2]  (Pl. 56.1

Resp. ¶ 49.)  The sheets have noting to do with the chemicals as formulated in the dye itself.  (Pl.

56.1 Resp. ¶ 49.)  Moriarty has never mixed, used, applied, chemically analyzed or otherwise tested

the dye or any other hair dye.  (Pl. 56.1 Resp. ¶ 40.)  He does not know what level of the allegedly

dangerous chemicals a consumer would be exposed to during use of the hair dye, not what level of

the allegedly dangerous chemicals is necessary to create a risk of allergic reaction beyond an

estimate of between a milligram and one pound.  (Pl. 56.1 Resp. ¶ 41.)  Moriarty concluded that the

dye is unreasonably dangerous "was based upon the fact that it was made up of dangerous chemicals

and that if you mix dangerous chemicals you get a dangerous product."  (Def. 56.1 Resp. ¶ 27.)

Although he stated he could formulate a hair dye that would eliminate the possibility of allergic

reaction, he had not actually done so, and he admitted that he does not know whether he could "get

rid of the toxic chemicals" and "still produce an effective hair dye."  (Pl. 56.1 Resp. ¶¶ 43-44.)

According to Moriarty, the dye is a "classical formulation."  (Pl. 56.1 Resp. ¶ 25.)  He is not familiar

with any other commercially available hair dye that is as effective but contains none of the toxic

chemicals.  (Pl. 56.1 Resp. ¶ 45.)

### (b)     Methodology to Opine the Dye's Warnings and Self-Test Instructions Were Inadequate

Moriarty further opined that Clairol's instructions for the allergy test were too vague for a

consumer to obtain a reliable result.  (Pl. 56.1 Resp. ¶ 53.)  Specifically, he opined that the

instructions to use a plastic bowl and spoon is inadequate because the size of the bowl and spoon

---

[2]The deposition testimony cited by Moore in her response to Clairol's 56.1 statement does not properly dispute
this fact and the fact is deemed admitted.  In the deposition testimony cited by Moore in response to this statement,
Moriarty testified that one of the material data safety sheets he reviewed listed the concentrations that could harm
particular animals.  (Moriarty Dep., Pl. Ex. F, 120:15-121:14.)

is not described, and the terms "small" and "equal parts," which describe the amount of dye components to use in the self allergy test, are not precise and could lead to false negatives. (Def. 56.1 Resp. ¶¶ 28, 30.) He made this determination based on: (1) his experience as a scientist; (2) his review of the self-test as written; (3) his reflection on the test and potential alternative scenarios; (4) his review of materials from Clairol regarding the adequacy of the self-test; and (4) he reviewed the testimony of one of Moore's treating physicians regarding the practice of using patch tests in medical settings. (Def. 56.1 Resp. ¶ 29.)

Moriarty did not examine how other hair dye manufacturers formulate their allergy test, nor does he know whether any manufacturers utilize any other kind of test. (Pl. 56.1 Resp. ¶ 55.) He never attempted to perform the product's allergy test himself, observed anyone else performing the test on themselves, or "ask[ed] anybody else how they interpreted the test." (Pl. 56.1 Resp. ¶ 56.)[3] He proposed two alternative allergy tests: a band-aid pre-treated with the dye, and a system involving droppers and bowls provided by the manufacturer. (Def. 56.1 Resp. ¶ 31.) He did not test those alternative warnings, or instructions in any way. (Pl. 56.1 Resp. ¶ 56.) Moriarty gave no testimony indicating that the allergy test breached the industry standard of care. (Pl. 56.1 Resp. ¶ 61.) He confirmed that "the fact that hair dye can cause an allergic reaction" is "adequately communicated by the warning[s] on the box." (Pl. Resp. ¶ 63.) Further, Moriarty does not dispute that the 48-hour time period was clearly and adequately communicated or that 48 hours is an appropriate time period for an allergy test for hair dye. (Pl. 56.1 Resp. ¶ 64.)

### (c) Moriarty Failed to Opine as to Medical Causation

---

[3]Specifically, Moriarty testified: "I did not do the test myself so – nor did I subject any other human being to the test . . . [s]o I have no independent experimentation to formulate my opinion. I'm just formulating on the basis of description and what I know in my training as a scientist." (Moriarty Dep., Pl. Ex. K, 189:22-190:3.)

10

Moriarty's causation opinion is based upon the opinions and conclusions of Moore's treating medical physicians: Dr. Nicholas Recchia and Dr. M. Ghani. (Def. 56.1 Resp. ¶ 32.) Moriarty is not an expert in the field of dermatology or immunology. (Pl. 56.1 Resp. ¶ 28.) In fact, this case is the only case on allergic reaction to hair dye with which Moriarty is familiar. (Pl. 56.1 Resp. ¶ 31.) He stated that the amount of chemicals in hair dye that would cause an allergic reaction when in contact with human skin is "beyond [his] expertise" and that question "gets into the area almost of medicine." (Pl. 56.1 Resp. ¶ 30.) Moriarty has not written, taught, published or done any work concerning allergic reactions to any of the chemicals present in the dye. (Moriarty Dep., Pl. Ex. K, 65:10-21.) Other than his work on this case, he has never written, taught or done any other work regarding the potential for an allergic reaction to any substance or chemical. (Pl. 56.1 Resp. ¶ 32.)

## II.    STANDARD OF REVIEW ON MOTION TO EXCLUDE EXPERT TESTIMONY

Whether scientific expert testimony is admissible is determined by reference to Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Moore, as the proponent of Moriarty's testimony, bears the burden of proof with respect to whether the admissibility requirements are met. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009).

Rule 702 assigns the trial judge the "gate-keeping function" of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 492 F.3d at 589, 597. The focus of this decision "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 492 F.3d at 595. The Court applies a three-step analysis for determining the admissibility of expert testimony under Rule 702. *See Ervin*, 492 F.3d at 904.

First, "the witness must be qualified 'as an expert by knowledge, skill experience, training, or education.'" *Id.* (quoting F.R.E. 702.) Second, "the expert's reasoning or methodologies underlying the testimony must be scientifically reliable." *Id.* Third, the expert's testimony must be relevant, that is, it must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.*

III.    **DISCUSSION**

      A.    **Moriarty's Methodology to Conclude the Dye Is Unreasonably Dangerous Is Unreliable**

Clairol challenges Moriarty's opinion using the first and second prongs this test: (1) Moriarty is not qualified to reach his opinion; and (2) his methodology is not reliable. Because the Court finds that Moriarty's methodology in reaching that opinion is flawed and unreliable, there is no need to address Moriarty's qualifications to render the opinion.

Here, Moriarty concluded that the dye contains a number of chemicals that could be dangerous in certain settings. He reached this conclusion by looking at their material safety data sheets. So far, so good. But from that premise, he jumped to the conclusion that the dye itself is unreasonably dangerous because "if you mix dangerous chemicals you get a dangerous product." The problem is, he never mixed, used, chemically analyzed or tested the dye at issue, or any other hair dye. In other words, Moriarty performed no scientific analysis to determine the amounts of those dangerous chemicals that appear in the dye, and never had that information from another source. (Moriarty Dep., Pl. Ex. K, 136:14-19). Instead of testing the formulation of the dye itself, he relied on material safety data sheets for the individual chemicals in the dye. Those sheets, however, are created by chemical manufacturers to meet OSHA requirements for safe handling of the chemicals. The sheets have no connection with the manufacture of the dye, and further, do not

reveal the concentration or formulation of the chemical ingredients in the dye at issue or any other hair dye. When asked if the material safety data sheets "speak to how much any of these particular chemicals a user of the hair dye will be exposed to through the hair dying process," Moriarty responded, "[n]o, because the material safety data sheet is specific to the chemical . . . [i]t's not specific to the dye . . . ." (Moriarty Dep., Pl. Ex. K., 111:12-17.) Further, those sheets do not list the amount of each chemical that is required to cause a reaction in humans.

Moriarty's methodology is similar to the methodology of the expert excluded by the Seventh Circuit in *Fuesting v. Zimmer, Inc.*, 421 F.3d 528 (7th Cir. 2005). In that case, the plaintiff's expert opined that a knee implant was defective because it was not sterilized correctly and that failure to sterilize caused the plaintiff's injuries. *Id.* at 531. The court noted that one "indicator of unreliability is the unjustifiable extrapolation from an accepted premise to an unfounded conclusion" and the "most significant Daubert factor is whether the scientific theory has been subjected to the scientific method." *Id.* at 536. Because he did not test or analyze the dye, or otherwise know the concentrations of the different chemicals in the dye, he had no scientific basis to opine whether those dangerous chemicals appear in the dye in such concentrations so as to make the dye an unreasonably dangerous product. That failure makes his methodology unreliable. *See Fuesting*, 421 F.3d at 536 (finding "the problem here is [the expert] did not bridge the analytical gap between these basic principles and his complex conclusions . . . he did not specify [with respect to the product at issue], what quantum of each variable is required to set this agreed upon chain reaction in motion . . . basic polymer science alone cannot answer these questions.").

At least one court in th Circuit similarly excluded an expert for using the same material safety data sheet approach as Moriarty used here due to this fundamental flaw in methodology. *See*

*Lemmermann v. Blue Cross Blue Shield of Wisc.*, 713 F. Supp. 2d. 791, 801-02 (E.D. Wisc. 2010) (Stadtmueller, J.) (striking expert testimony and noting "[i]n essence [the expert's] 'methodology' involved reading several labels and data sheets [on the chemical at issue] and, at best, parroting the conclusions of the authors of those data sheets.") As a matter of logic, products that contain dangerous chemicals are not, per se, unreasonably dangerous. Numerous household cleaners and yard care products contain a cacophony of dangerous substances; yet those products are not deemed *unreasonably* dangerous. Indeed, using Moriarty's methodology, natural soap would be an unreasonably dangerous product, because it contains a dangerous chemical—lye (sodium hydroxide)—that causes chemical burns and scarring when it contacts the skin. Put simply, given his methodology, Moriarty cannot state whether an individual, as a result of using the dye, will be exposed to enough dangerous chemicals to cause a reaction. Accordingly, the methodology Moriarty used was not reliable, and his opinion that the dye is unreasonably dangerous is excluded.

### B. Moriarty Is Not Qualified to Opine Regarding the Dye's Warnings

Moriarty does not quibble with the dye's warning that it could cause an allergic reaction. Rather, his primary objection is to the allergy test instructions; he asserts is that they are vague and imprecise to the consumer and, as such, will lead to false negatives. Specifically, he opined: (1) the directions to use a plastic bowl and spoon are vague because they do not specify the size of the bowl and spoon; and (2) the instructions to use a "small" amount of the dye, composed of "equal parts" of the two separate agents in the dye, is imprecise. Clairol asserts that Moriarty's opinions concerning Moore's failure to warn claim must be excluded because Moriarty is not qualified to render those opinions and his methodology is unreliable.

Under Federal Rule of Evidence 702, an expert witness must be qualified to testify by "knowledge, skill, experience, training, or education." F.R.E. 702. With regard to his proposed testimony concerning Clairol's instructions, Moriarty has none of these qualifications. He has no background or training in psychology or any field related to the design of warnings to consumers. He has only the most minimal experience with what should appear on a warning label, and no experience in how a consumer interprets a warning or self-test instructions.[4] Moore asserts that Moriarty is qualified because, as a trained scientist, he has done thousands of tests in the laboratory where he is mixing chemicals together. (Pl. Resp. at 11.) That may be so, but that laboratory experience does not mean he has any particular insight into how an average, non-scientist consumer would interpret the instructions at issue. As such, Moriarty is not qualified to opine on a consumer's interpretation of the dye's instructions.

## C. Moriarty's Methodology to Conclude the Warnings Were Insufficient Is Unreliable

As with his other opinions, Moriarty did no testing to reveal how a consumer interprets the dye's allergy test instructions. He did not ask anyone else to interpret the test, or conduct an experiment to determine whether consumers interpreted "small" and "equal parts" so differently as to suggest the dye's instructions could not be followed with precision by a consumer. Instead, he substituted his own experience of mixing chemicals in the laboratory and "reflecting" upon how a consumer could botch the test. That is different than showing by testing that the consumer actually botched the test. *See Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002) (holding "[p]ersonal observation is not a substitute for scientific methodology and is insufficient to satisfy

---

[4]Moriarty's only experience with consumer labeling was when he "was consulted on what [he] thought should be included on the label" for a commercial product called treprostinil. (Moriarty Dep., Pl. Ex. K, 75:9-13.)

*Daubert*'s most significant guidepost.") Moriarty stopped halfway through the scientific method by only hypothesizing. The essence of the scientific method is *testing* a hypothesis, something Moriarty failed to do here. *See Fuesting*, 421 F.3d at 536 (noting "[t]he first and most significant *Daubert* factor is whether the scientific theory has been subjected to the scientific method.") (internal quotation omitted).

**D.      Moore Cannot Rely on Undisclosed Experts to Establish Causation**

As Moore readily asserts, her causal chain requires both Moriarty and Drs. Recchia and Ghani, Moore's treating physicians. (*See* Pl. Resp., Doc. 75, at 3-4 ("Dr.Moriarty has not been presented as an expert witness on the issues of medical causation . . . [t]he plaintiff and Dr.Moriarty rely upon plaintiff's treating physicians . . . to establish medical causation").) Under Illinois law, for both negligence and strict liability claims attacking the design of a product, the plaintiff must establish a defective condition and "a causal link between the alleged design defect . . . and [the plaintiff's] injury. *Fuesting*, 421 F.3d at 532 (citing *Carrizales v. Rheem Mfg. Co.*, 589 N.E.2d 569, 580 (Ill. App. Ct. 1991) and *Baltus v. Weaver Division of Kidde & Co.*, 557 N.E.2d 580, 586 (Ill. App. Ct. 1990)). The treating physicians are not qualified to opine that the dye is unreasonably dangerous and Moriarty is not qualified to conclude that the dye caused plaintiffs' injuries from a medical perspective.

Moore did not name her treating physicians as witnesses that would provide opinion testimony per Federal Rules of Evidence 702, 703 and 705. *See* Fed. R. Civ. P. 26(a)(2). Rather, she named only Moriarty. (*See* Doc. 80-2.) If treating physicians will present opinion testimony, they must be disclosed with Rule 26(a)(2). *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7 th Cir. 2004); *see also Jimenez v. United States*, No. 06-c-5943, 2008 WL 3849915, at *4 (N.D.

16

Ill. Aug. 14, 2008) (Dow, J.) (excluding treating physician opinion testimony and noting "Rule 26(a)(2) is designed so that a party does not have to assume that each of the opposing party's treating physicians might be called as expert witnesses at trial.")  In *Musser*, the Seventh Circuit affirmed the exclusion of opinion testimony from treating physicians in circumstances nearly identical to the instant case.  There, like here, the plaintiffs disclosed the treating physicians their Rule 26(a)(1) disclosures and the defendant deposed them, but the plaintiffs failed to disclose them pursuant to Rule 26(a)(2).  *Musser*, 356 F.3d at 751.  In affirming the district court's exclusion of the treater's opinion testimony, the court found:

> Formal disclosure of experts is not pointless.  Knowing the identity of the opponent's expert witness allows a party to properly for trial . . . . The failure to disclose experts prejudiced the [defendant] because there are countermeasures that could have been taken that are not applicable to fact witnesses, such as attempting to disqualify the expert testimony on grounds set forth in [*Daubert*], retaining rebuttal experts, and holding additional depositions to retrieve the information not available because of the absence of a report.

*Id.* at 757-58.  Further, it does not matter, for Rule 26(a)(2) disclosure purposes, that a treating physician formed her opinions during the course of treating the plaintiff, rather than for purposes of the litigation.  *Id.* at 757 n.2 ("a treating doctor . . . is providing expert testimony if the testimony consists of opinions based on 'scientific, technical, or other specialized knowledge' regardless of whether those opinions were formed during the scope of interaction with a party prior to litigation.")  The requirement that treating physicians are properly disclosed is particularly justified in a product liability suit like this one, where expert testimony is critically important because such testimony  is almost always required on matters of causation and the jury is often asked to resolve a "battle of the experts."  Drs. Recchia and Ghani therefore may not opine on medical causation because Plaintiff failed to disclose them as experts.  Setting asideMoriarty's stated "opinion" that Moore's injuries

were caused by the dye, which he admits is based on the testimony of Drs. Recchia and Ghani, Moore has no expert testimony on causation.

### D. Clairol Is Entitled to Judgment as a Matter of Law

Clairol asserts that without expert testimony that the dye is unreasonably dangerous and caused Moore's injuries, Clairol is entitled to judgment as a matter of law. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moore must show an unreasonably dangerous product caused her injuries. *See Fuesting*, 421 F.3d at 532. Clairol asserts, and Moore does not dispute, that the questions of whether the dye with is unreasonably dangerous and whether it caused Moore's injuries are not "within the ken of the ordinary person." *Goffman v. Gross*, 59 F.3d 688, 672 (7th Cir. 1995) (finding that lay witnesses cannot testify as to the medical effects of second-hand smoke). Consequently, Moore cannot prove her claims and Clairol is entitled to summary judgment. *See Ervin*, 492 F.3d at 905 (affirming summary judgment where district court properly struck expert in a product liability case requiring expert testimony on causation).

## IV. CONCLUSION

For the foregoing reasons, Clairol's combined motion (Doc. 62) is granted and final judgment is entered for Clairol pursuant to Federal Rule of Civil Procedure 58.

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: **March 18, 2011**